11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

William Glenn

Appellant

Vs.                   No.
11-01-00028-CR B Appeal from Dallas County

State of Texas

Appellee

 

                                                             Memorandum
Opinion                         

After a
nonjury trial, the trial court found that William Glenn was guilty of
aggravated assault, that the two enhancement paragraphs were true, and that he
had used his arm as a deadly weapon. 
The trial court sentenced appellant to confinement for life.  We affirm the conviction.

                                                                   The
Indictment

The
indictment charged that, on or about February 17, 2000, appellant did
intentionally cause bodily injury to Katrina Coleman by choking her with his
arm and that appellant Adid use and exhibit a deadly weapon to-wit: defendant=s arm, during the commission of the assault.@

                                                                   Points
of Error

Appellant
presents two points of error.  In the
first point, he argues that the evidence is Alegally insufficient@ to prove the elements of the offense of aggravated assault.  In the second point, he argues that the
evidence is Alegally insufficient@ to prove the use of a deadly weapon.

                                                              Controlling
Authority

The trial
court in this case, as the finder of facts in a nonjury trial, was the sole
judge of the weight of the evidence and of the credibility of the
testimony.  Adelman v. State, 828 S.W.2d
418, 421 (Tex.Cr.App.1992); DeBolt v. State, 604 S.W.2d 164, 167
(Tex.Cr.App.1980).  The trial court was
free to believe all or any part of the testimony of each of the witnesses, and
this court is not authorized to disagree with the trial court=s findings unless necessary to prevent Aa manifest injustice.@  See,
e.g., Johnson v. State, 23 S.W.3d 1, 9 (Tex.Cr.App.2000); Cain v. State, 958
S.W.2d 404, 407 (Tex.Cr.App.1997).








In
reviewing the Alegal sufficiency@ of the evidence, we must look at the
evidence Ain the light most favorable to the
prosecution@ and determine whether any rational trier of
fact could have found the essential elements of the offense beyond a reasonable
doubt.  See, e.g., Jackson v. Virginia,
443 U.S. 307, 319 (1979); Cardenas v. State, 30 S.W.3d 384, 389
(Tex.Cr.App.2000). 

The
definition of a Adeadly weapon@ in TEX. PENAL CODE ANN. ' 1.07(17)(B) (Vernon 1994) includes Aanything that in the manner of its use or intended use is
capable of causing death or serious bodily injury.@ 
(Emphasis added)  See and compare
McCain v. State, 22 S.W.3d 497, 503 (Tex.Cr.App.2000); Turner v. State, 664
S.W.2d 86, 88-90 (Tex.Cr.App.1983). 
While an arm is not per se a deadly weapon, the fact finder may find
that it was used as a deadly weapon if the evidence supports that finding.  This court has affirmed a deadly weapon
finding based upon a defendant=s use of his hands or feet in a manner capable of causing serious
bodily injury.  See Clark v. State, 886
S.W.2d 844, 845 (Tex.App. - Eastland 1994, no pet=n), which was cited and followed by Brooks v. State, 900 S.W.2d 468,
472 (Tex.App. - Texarkana 1995, no pet=n), where the court said:

To support
a deadly weapon finding, the State must show only that the accused=s hands in the manner of their use were
capable of causing death or serious bodily injury.  It need not show that the hands actually did cause serious
bodily injury.  (Emphasis added;
Citation omitted)

 

A Asimple@ assault becomes an Aaggravated assault@ if the assault causes serious bodily injury or if the aggressor Auses or exhibits a deadly weapon during the
commission of the assault.@  See TEX. PENAL CODE ANN. '' 22.01 & 22.02 (Vernon 1994 & Supp.
2002).  The State was not required to
prove serious bodily injury when it proved that appellant used or exhibited a
deadly weapon.

                                                                Relevant
Evidence








There were
only two witnesses during the guilt/innocent phase of trial.[1]  The complainant was the first witness.  She testified that appellant had been her Aboyfriend@ from July of 1999 until the assault in February of 2000.  Appellant had moved into her apartment.  The complainant worked at Parkland Hospital.  On the day of the assault, she got home from
work about 5:30 p.m.  Appellant had been
drinking gin with one of the neighbors. 
They were in the apartment, and the complainant went outside to visit
with her friends.  She visited with them
until dark and then went back into her apartment.  Appellant was in the apartment, and the neighbor had gone
home.  The complainant got a phone call,
and appellant got mad when she would not let him help with her sister=s problem. 
Then appellant Agot
upset@ and went to the AHispanic club across the street.@  The
complainant said that, when appellant came back to the apartment, he was Adrunk and upset@ and that he was still Aarguing.@  They
went upstairs and got ready for bed. 
Then appellant went downstairs. 
He was standing in the front door with the door open, and she went
downstairs to get a drink of water.  The
complainant testified in relevant part as shown during her direct examination
by the assistant district attorney:

Q: What
are you doing when you=re
walking towards the kitchen?

 

A: Saying my remarks back to him, whatever he
said to me I replied back.  

 

Q: Do you
recall what you said?

 

A: No, I
don=t. 
But whatever it was it caused him to get very upset.

 

Q: What do
you mean very upset?  What did he do?

 

A: He
grabbed me from behind when I was walking in the kitchen.  He started to strangle me with his arm
around my neck.

 

                                                           *    *   
*

 

Q: What
was going through your mind at that point?

 

A: That I
was going to die.

 

Q: Could
you feel him applying more pressure to your neck?

 

A: Yes.

 

Q: What
happened after that?

 

A: After
he applied pressure to my neck I played like I had fainted so he could stop
choking me, strangling me with his arm. 
So I played like I got limp, like I had already passed out.

 

                                                           *    *  
 *

 








Q: But you=re just pretending at that point.

 

A: Pretending.

 

Q: And then he starts
choking you again.

 

A: Even more tighter.  He never let me go, period.  He never let me go.  He was continuing to hold my neck.  He knew I was playing like I was already
passed out.  I guess I moved, I don=t know what I did.  I don=t know
if I moved to let him know I was still alive. 
He got more tighter and tighter until I actually did pass out.

 

[Then a
series of photographs were admitted into evidence.  Those photographs were made by a police officer on the morning
after the assault.]

 

The only other witness during the first phase of trial was Donald J.
Smith, Jr., Ph.D., the research director for violence intervention and
prevention at Parkland Hospital.  Dr.
Smith testified as an expert witness on family violence, and he testified that Athe arm can be used as a weapon to severely
injure or fatally injure an individual.@  Dr. Smith reviewed the
photographs of the complainant which were made on the morning after the
assault.  Relevant portions of his
testimony read as shown:

Q: Could you just tell
the Court what your findings are as far as looking at the pictures.  Would that be a victim consistent with
strangulation?

 

A: Yes, it would.  Most notable are the blood that is - - blood
that appears in the eyes.  From the
ruptured blood vessels within the eyes. 
Also if you look about the face you can see tiny blood vessels, the
petechia that are about the cheeks and the eyes on the - - just underneath the
eyes on both sides of the face.  Looks
like some around the chin as well. 
Possibly some on the chin as well.

 

Q: And what about if...a
victim gets to the point of where they actually black out.  Do you have an opinion how severe that
strangulation could be?

 

A: The strangulation - -
the victim will lose consciousness within about ten to fifteen seconds if the
arteries are occluded completely at both arteries.  If they are blocked.

 

Q: And again that can
cause death.

 








A: Death usually results
in anywhere from three to five minutes if the pressure is maintained to the
neck.

 

Dr. Smith also testified that he had reviewed the hospital records on
the complainant which were introduced into evidence, that he had personally
interviewed the complainant, that the pictures showed the way the complainant
looked when he interviewed her, and that her injuries were consistent with
strangulation.  Dr. Smith testified
that, based upon what he saw Awith the blood in the eyes,@ he was impressed by the Aseverity of the attack involved here.@

Points of Error Nos. 1 and 2 are overruled.

                                                    This
Court=s Ruling

The judgment of the trial court is affirmed.

 

BOB DICKENSON

SENIOR JUSTICE

 

May
30, 2002

Do
not publish.  See TEX.R.APP.P. 47.3(b).

Panel consists of:  Arnot, C.J., and

McCall, J., and
Dickenson, S.J.[2]











[1]We need not discuss evidence from the punishment phase
of trial, but there were three other women who had lived with appellant and who
testified as to other violent acts by appellant and to his threats to kill each
of them.





[2]Bob Dickenson, Retired Justice, Court of Appeals, 11th
District of Texas at Eastland sitting by assignment.